1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    DAVID EDWARDS,                              No.  2:13-cv-2218 JAM DB P

12                    Plaintiff,

13          v.                                    ORDER AND

14    SWARTHOUT,                                  FINDINGS AND RECOMMENDATIONS

15                    Defendant.

16

17          Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights

18   action pursuant to 42 U.S.C. § 1983. This matter proceeds on plaintiff's original complaint

19   against defendant Warden Gary Swarthout on equal protection and due process claims for the

20   defendant's implementation of two modified programs at California State Prison in Solano,

21   California ("CSP-Solano").

22          Pending now are the parties' cross-motions for summary judgment. Plaintiff moves for

23   summary judgment on the ground that there is no dispute of material fact as to either of his

24   claims. Defendant moves for summary judgment on the grounds that (a) plaintiff failed to exhaust

25   his administrative remedies as to the second modified program, (b) defendant did not violate

26   plaintiff's constitutional rights, and (c) defendant is entitled to qualified immunity. Each of the

27   motions is fully briefed and ready for disposition.

28   ////

1  | **I.       Plaintiff's Allegations**

2  | In the amended complaint, plaintiff, a White inmate, brings suit against Warden Swarthout

3  | for implementing two modified programs—the first in July 2010 and the second in February

4  | 2011—in response to separate incidents involving White inmates. Plaintiff was not involved in

5  | either of these incidents but was nonetheless subjected to the restrictions imposed on all White

6  | inmates. Per plaintiff, defendant's implementation of the modified programs violated plaintiff's

7  | "Eighth Amendment rights, and Fourteenth Amendment constitutional rights to due process and

8  | equal protection, …." Compl. at 2 (ECF No. 1 at 7).

9  | **II.      Relevant Procedural Background**

10 | Plaintiff initiated this action on October 23, 2013. (ECF No. 1.) Defendant filed an answer

11 | on December 15, 2014, and a Discovery and Scheduling Order ("DSO") issued on December 24,

12 | 2014. (ECF Nos. 18, 19.) Pursuant to the DSO, the discovery deadline was set for April 10, 2015,

13 | and the dispositive motion deadline was set for July 6, 2015.

14 | On June 15, 2015, plaintiff filed a motion for summary judgment. (ECF No. 25.)

15 | Defendant filed a cross-motion for summary judgment on July 6, 2015. (ECF No. 27.) These

16 | motions are fully briefed.

17 | **III.     Plaintiff's Discovery Motion**

18 | On March 5, 2015, plaintiff filed a motion to have his requests for admissions deemed

19 | admitted pursuant to Federal Rule of Civil Procedure 36(a) due to the defendant's failure to

20 | respond to those requests within thirty days. For the reasons set forth here, this motion will be

21 | denied.

22 | Under Rule 36(a)(3), "A shorter or longer time for responding may be stipulated to under

23 | Rule 20 or be ordered by the court." Pursuant to this Rule, the December 24, 2014, DSO

24 | specifically extended the time period for a response: "Responses to written discovery requests

25 | shall be due forty-five days after the request is served." DSO at 4 ¶ 2. In addition, defendant was

26 | granted an extension of time on March 2, 2015, to respond to plaintiff's written discovery. (ECF

27 | No. 22.) Defendant's failure then to respond to plaintiff's requests for admissions within thirty

28 | days is excused both by the DSO and the Court's March 2, 2015, Order.

**IV.    Defendant's Motion for Summary Judgment for Failure to Exhaust Administrative Remedies Related to the February 2011 Modified Program**

**A.    Legal Standards**

The Prison Litigation Reform Act ("PLRA") of 1995, requires that prisoners exhaust "such administrative remedies as are available" before commencing a suit challenging prison conditions." 42 U.S.C. § 1997e(a); see Ross v. Blake, ⸻ U.S. ⸻ 136 S. Ct. 1850 (June 6, 2016) ("An inmate need exhaust only such administrative remedies that are 'available.'"). Exhaustion is mandatory unless unavailable. "The obligation to exhaust 'available' remedies persists as long as some remedy remains 'available.' Once that is no longer the case, then there are no 'remedies ... available,' and the prisoner need not further pursue the grievance." Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005) (emphasis in original) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)).

This statutory exhaustion requirement applies to all inmate suits about prison life, Porter v. Nussle, 534 U.S. 516, 532 (2002) (quotation marks omitted), regardless of the relief sought by the prisoner or the relief offered by the process, Booth v. Churner, 532 U.S. 731, 741 (2001), and unexhausted claims may not be brought to court, Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524).

The failure to exhaust is an affirmative defense, and the defendants bear the burden of raising and proving the absence of exhaustion. Jones, 549 U.S. at 216; Albino, 747 F.3d at 1166. "In the rare event that a failure to exhaust is clear from the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6)." Albino, 747 F.3d at 1166. Otherwise, the defendants must produce evidence proving the failure to exhaust, and they are entitled to summary judgment under Rule 56 only if the undisputed evidence, viewed in the light most favorable to the plaintiff, shows he failed to exhaust. Id.

CDCR has an administrative remedy process for inmate grievances. Cal. Code Regs. tit. 15, § 3084.1 (2014). Compliance with section 1997e(a) is mandatory and state prisoners are required to exhaust CDCR's administrative remedy process prior to filing suit in federal court. Woodford v. Ngo, 548 U.S. 81, 85-86 (2006); Sapp v. Kimbrell, 623 F.3d 813, 818 (9th Cir.

1  2010).

2      CDCR's administrative grievance process for non-medical appeals consists of three levels

3  of review: (1) first level formal written appeals; (2) second level appeal to the Warden or

4  designees; and (3) third level appeal to the Office of Appeals ("OOA"). Inmates are required to

5  submit appeals on a standardized form (CDCR Form 602), attach necessary supporting

6  documentation, and submit the appeal within thirty days of the disputed event. Cal. Code Regs.

7  tit. 15, §§ 3084.2, 3084.3(a), 3084.8(b).

8      **B.    Analysis**

9      As noted <u>supra</u>, this action concerns two modified programs implemented at CSP-Solano:

10  the first in July 2010 and the second in February 2011. Plaintiff filed a grievance and completed

11  the administrative review process through all three levels of review for his claims related to the

12  July 2010 modified program, Appeal Log No. SOL-10-01051 ("the July 2010 grievance"). <u>See</u>

13  Pl.'s Mot. Summ. J. Exs. E-F; Pl.'s Reply to Def.'s Mot. Summ. J. Ex. B (ECF No. 28).

14      Defendant moves for summary judgment on plaintiff's claims related to the February

15  2011 modified program for failure to exhaust administrative remedies. In support, defendant

16  submits evidence that, although such remedies were available to him, plaintiff did not initiate a

17  new grievance concerning the February 2011 modified program. Instead, plaintiff merely

18  supplemented the July 2010 grievance and submitted it directly to the Director's level of review.

19  His concerns regarding the February 2011 modified program were dismissed after the decision

20  noted that plaintiff had "added new issues and requests to his appeal. The additional requested

21  action is not addressed herein as it is not appropriate to expand the appeal beyond the initial

22  problem and the initially requested action." Decl. of M. Voong in Supp. of Def.'s MSJ Ex. B

23  (ECF No. 27-5).

24      Plaintiff concedes that he did not file a separate grievance for the February 2011 modified

25  program, claiming that he did not need to initiate a new grievance because he "had no legal

26  requirement to file a separate appeal for an ongoing constitutional violation of discrimination …."

27  Pl.'s Reply at 7 (ECF No. 28). Notably, plaintiff does not claim that administrative remedies were

28  unavailable to him.

While plaintiff invokes the ongoing violation doctrine, the Supreme Court recently reaffirmed a strict interpretation of the exhaustion requirement and clarified that there are only "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Ross, 136 S. Ct. at 1859. These circumstances are as follows: (1) the "administrative procedure ... operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the "administrative scheme ... [is] so opaque that it becomes, practically speaking, incapable of use ... so that no ordinary prisoner can make sense of what it demands;" and (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1859-60 (citations omitted). Other than these circumstances demonstrating the unavailability of an administrative remedy, the mandatory language of 42 U.S.C. § 1997e(a) "foreclose[es] judicial discretion," which "means a court may not excuse a failure to exhaust, even to take [special] circumstances into account." Ross, 136 S. Ct. at 1856-57.

In this case, plaintiff has not demonstrated that the administrative procedures were a dead end, were so opaque as to be incapable of use, or that prison officials thwarted his ability to file a grievance. In the absence of one of these circumstances, the undersigned will recommend that defendant's motion for summary judgment for failure to exhaust administrative remedies be granted as to plaintiff's claims related to the February 2011 modified program.

**V.     The Parties' Cross-Motions for Summary Judgment Related to the July 2010 Modified Program**

**A.     Undisputed Facts**

Plaintiff is an unaffiliated White inmate who, at all relevant times, was housed at CSP-Solano. Def.'s Statement of Undisputed Facts ("DSUF") 1-2. Defendant Swarthout, as the Warden of CSP-Solano, approved the Program Status Report at issue here: PSR No. SOL-July-11-10-027. DSUF 4.

////

5

**1.      Race, Prison Violence, and Modified Programs**[1]

**a.      Modified Program Overview**

CSP-Solano is a Level III institution that houses violent felons. DSUF 5. At institutions like CSP-Solano, violence is a fact of life and can be directed at inmates or correctional staff. DSUF 5. In order to ensure the safety of all inmates after a serious incident, prison officials may modify or restrict program activities for some or all inmates by implementing a modified program affecting all or a portion of the inmate population. DSUF 8.

During a modified program, regular institutional programming is interrupted. DSUF 9. Affected inmates are not allowed out of their cells without being escorted. DSUF 9. Oftentimes, the escorts have further restrictions including additional mechanical restraints or additional officers. DSUF 9. All support programs for inmates, including educational programs, prison jobs, religious services, visitation, access to the law library, and group mental health, among others, may be restricted or unavailable. DSUF 9. These restrictions are continually evaluated and subsequently modified to allow access as soon as it is deemed safe to do so. DSUF 9.

**b.      Race as a Factor**

Race (or ethnicity) is one of the factors that can cause violence. DSUF 6. Inmates often segregate themselves by race, and within the various racial groups of inmates there are sub-groups of gangs or disruptive groups, such as the White Skin Heads, Black Guerilla Family, Mexican Mafia, Southern Hispanics, Bloods, Crips, etc. DSUF 6. Even inmates who are not affiliated with a gang or disruptive group sometimes join in or sympathize with members of their racial group, and gang members often pressure unaffiliated inmates of the same race to participate in violent activities. DSUF 7. Additionally, incidents that begin without racial animus often evolve into racial conflict. DSUF 7.  For instance, a fight between two inmates of different races that had nothing to do with race initially may erupt into a race riot. DSUF 7.

Under the California Department of Corrections and Rehabilitation's ("CDCR") policy at

---

[1] Plaintiff makes several vague, unsupported, and speculative objections to defendant's evidence. See Pl.'s Resp. to DSUF (ECF No. 29). Only those objections with proper evidentiary support will be noted herein.

the time, inmates' race and ethnicity may also be one of the factors that could be considered in determining the scope of a modified program. DSUF 8. The lockdowns, however, are never based solely on race or ethnicity. DSUF 8. Rather, prison officials use a systematic process of elimination to rule out potential gang and/or disruptive groups, personal issues, and/or possible retaliation issues. DSUF 8. Unless prison staff receives information clearing an entire group, an individual inmate cannot be released from modified program without putting inmates and staff at risk of further violence. DSUF 8.

### c.  Investigation of Incidents

After a modified program is implemented, prison officials begin an investigation to determine when normal programming may be safely resumed. DSUF 10. The investigation includes (a) interviews of inmates and staff; (b) searches of yards, cells, common areas and other areas of the prison for evidence, weapons, and contraband; (c) review of video surveillance; and (d) a daily review by the Warden or his/her designee of the information collected. DSUF 10-11. In addition, the Warden or designee is required to provide weekly updates to his superiors regarding the prison's efforts to return to normal programming. DSUF 11.

The investigation process can be slow, time-consuming, and labor intensive. DSUF 15. Correctional staff are often diverted from other facilities to assist with escorts or conduct interviews and searches. DSUF 15. For this reason, modified programs drain manpower and stretch institutional resources. DSUF 15. Additionally, prison officials must meet constantly and thoroughly document all updates on a program status report, which imposes administrative burdens as well. DSUF 15.

### d.  Return to Normal Programming

One risk of prematurely lifting a modified program is further incidents of violence, including the loss of life. DSUF 16. Given the seriousness of this risk, caution is warranted and the gradual return to normal programming is recommended. DSUF 16. Striking the right balance between ensuring the safety and security of inmates, staff, and the institution on one hand, and returning inmates to normal programming and regular exercise as soon as safely possible on the other, is difficult. DSUF 16.

Once prison officials determine that it is safe to do so, inmates are gradually returned to normal programming in phases, beginning, for example, with the incremental restoration of specified program activities. DSUF 12. The determination to return to normal programming is made based on the totality of circumstances, including the absence of information indicating potential for further violence. DSUF 12. If an incremental release is successful, more inmates and privileges are restored until all the inmates' privileges are restored. DSUF 12.

Releasing inmates to the recreation yard creates the biggest security risk because large groups of inmates are able to congregate and interact in a less controlled area. DSUF 13. The number of inmates on a yard greatly outnumbers the correctional staff members assigned to monitor the area. DSUF 13. On the yard, inmates can commit assaults, communicate threats, plan illegal activities, and exchange or obtain weapons or contraband, that could result in injury or even death to inmates and staff. DSUF 13. Following a return to a normal program, violence is most likely to occur on an exercise yard. DSUF 13. Thus, among all of the programming activities that are suspended during a modified program, it is most difficult to determine when exercise programs can safely resume. DSUF 13.

Releasing one group at a time to the yard is not practical or efficient because of the limited staff available to supervise the inmates, especially when much of the staff resources are directed to cell searches and interviews because of the ongoing investigations. DSUF 14. Also, releasing one group of inmates to the yard at a time gave that group an opportunity to organize or coordinate further attacks. DSUF 14.

## 2.    The July 2010 Modified Program

On July 11, 2010, a Black officer was found seriously injured on the main kitchen back dock between Facilities I and II. DSUF 18. The officer was found unconscious and appeared to have been assaulted. DSUF 18. The inmates working on the main kitchen back door were placed into administrative segregation pending investigation into their possible involvement. DSUF 18. Plaintiff submits an administrative grievance filed by an inmate witness who claimed that the officer provoked the attack, and that the attack involved only one inmate. Pl.'s Statement of Undisputed Facts 4 (ECF No. 25).

As a result of this incident, all inmates on Facilities I and II were placed on modified program pending further investigation. DSUF 18. This incident resulted in PSR No. SOL-July-11-10-027. DSUF 18.

Following an investigation, it was determined that two of the inmates who were working the back dock were White Skin Heads who assaulted the officer, and they were immediately transferred to another institution. DSUF 19. Although the perpetrators were identified, the cause of the assault had not yet been determined. DSUF 19. For example, it was not yet determined whether the incident was personal, gang-related, or racially-motivated, or whether it was the result of an ordered hit with additional staff potentially at risk. DSUF 19. Given these unknown factors, the severity of the assault, and that a Black officer was assaulted by White inmates, staff did not know whether further violence would occur due to tension between other White inmates and/or possible retaliation from Black inmates. DSUF 19. Therefore, in order to minimize the risk of further violence, the modified program was continued for all inmates on Facilities I and II pending further investigation. DSUF 19. This modified program affected a total of 1710 inmates, including 764 Black inmates, 278 White inmates, 358 Hispanic inmates, and 148 "Other" inmates. DSUF 19. Inmates on the other facilities, III and IV, were not placed on modified program. DSUF 20.

As a result of the modified program, various restrictions were instituted, including one-to-one restrained escorts, unclothed body searches prior to escorts, cell feeding, no visits, no inmate workers, no showers, no legal library, no dayroom activities, no recreation yard, no canteen, no packages, no phone calls, and no religious services. DSUF 22.

Warden Swarthout immediately ordered interviews to be conducted of the inmates working on the main kitchen back dock at the time of the event, of the officer who was hurt, and of inmates of different races on Facilities I and II.  DSUF 21. Due to the direct involvement of two White inmates, the incident was determined to be "group related," as opposed to an isolated incident between two individual people, because at least two White inmates were determined to be involved in the staff assault. DSUF 21. This suggested that other White inmates were also possibly involved. DSUF 21.

On July 12, 2010, as investigations were ongoing, escorting for White inmates remained one-to-one but escorting for all other inmates was modified to five-to-one, meaning five inmates were escorted by only one officer. DSUF 23. This was because the attackers were identified as White inmates and based on the information received thus far, it was determined that White inmates posed a greater security threat. DSUF 23.

On July 14, 2010, all inmates with the exception of White inmates on Facilities I and II returned to normal programming.  This was due because the investigation had revealed that the incident was confined to White inmates and did not involve inmates of other races. DSUF 24. By restricting those inmates who might initiate or be subjected to further violence, Warden Swarthout was trying to safeguard the safety and security of all inmates, staff, and the institution, while restricting the normal programming of the fewest number of inmates. DSUF 24. At this time, restrictions of the modified program were further eased to allow showers three days a week and to allow chaplains to make rounds within the housing units. DSUF 24.

On July 23, 2010, as investigations continued, restrictions of the modified program were further eased to allow limited legal library use for inmates with approved court deadlines. DSUF 25. On August 5, 2010, restrictions were further eased to allow inmates to resume normal programming within their housing units and normal feeding in the facility dining hall. DSUF 26. This gradual resumption of normal programming allowed staff the opportunity to observe inmate interaction and behavior in small groups and in a controlled setting. DSUF 26.

By August 12, 2010, all inmates returned to normal programming. DSUF 27. This modified program resulted in the denial of yard privileges to White inmates for approximately thirty days. DSUF 27.

A state of emergency requiring the approval of the Secretary or Secretary's designee is required when a lockdown of all housing units and sub-facilities within a facility is to exceed 24 hours, or a lockdown of fewer than all housing units and sub-facilities within a facility is to exceed 72 hours. DSUF 39. The July 2010 modified program complained of in this lawsuit did not meet the criteria for a State of Emergency because it was changed from affecting all inmates within a facility to less than all inmates within a facility within three days. DSUF 39.

10

1        **B.      Legal Standards**

2        Summary judgment is appropriate when the moving party "shows that there is no genuine

3    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

4    Civ. P. 56(a).

5        Under summary judgment practice, "[t]he moving party initially bears the burden of

6    proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d

7    376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving

8    party may accomplish this by "citing to particular parts of materials in the record, including

9    depositions, documents, electronically stored information, affidavits or declarations, stipulations

10   (including those made for purposes of the motion only), admission, interrogatory answers, or

11   other materials" or by showing that such materials "do not establish the absence or presence of a

12   genuine dispute, or that the adverse party cannot produce admissible evidence to support the

13   fact."  Fed. R. Civ. P. 56(c)(1).  "Where the non-moving party bears the burden of proof at trial,

14   the moving party need only prove that there is an absence of evidence to support the non-moving

15   party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R.

16   Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, "after adequate time for

17   discovery and upon motion, against a party who fails to make a showing sufficient to establish the

18   existence of an element essential to that party's case, and on which that party will bear the burden

19   of proof at trial."  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an

20   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

21   Id. at 323.  Summary judgment should be granted, "so long as whatever is before the district court

22   demonstrates that the standard for entry of summary judgment . . . is satisfied."  Id. at 323.

23       If the moving party meets its initial responsibility, the burden then shifts to the opposing

24   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

25   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In attempting to establish the

26   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

27   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

28   admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P.

1    56(c)(1); <u>Matsushita</u>, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in

2    contention is material, i.e., a fact "that might affect the outcome of the suit under the governing

3    law," <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific</u>

4    <u>Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e.,

5    "the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"

6    <u>Anderson</u>, 447 U.S. at 248.

7        In the endeavor to establish the existence of a factual dispute, the opposing party need not

8    establish a material issue of fact conclusively in its favor.  It is sufficient that "'the claimed

9    factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

10   truth at trial.'"  <u>T.W. Elec. Serv.</u>, 809 F.2d at 630 (quoting <u>First Nat'l Bank v. Cities Serv. Co.</u>,

11   391 U.S. 253, 288-89 (1968).  Thus, the "purpose of summary judgment is to pierce the pleadings

12   and to assess the proof in order to see whether there is a genuine need for trial."  <u>Matsushita</u>, 475

13   U.S. at 587 (citation and internal quotation marks omitted).

14       "In evaluating the evidence to determine whether there is a genuine issue of fact, [the

15   court] draw[s] all inferences supported by the evidence in favor of the non-moving party."  <u>Walls</u>

16   <u>v. Central Contra Costa Transit Auth.</u>, 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted).  It is

17   the opposing party's obligation to produce a factual predicate from which the inference may be

18   drawn.  <u>Richards v. Nielsen Freight Lines</u>, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

19   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

20   some metaphysical doubt as to the material facts."  <u>Matsushita</u>, 475 U.S. at 586 (citations

21   omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

22   non-moving party, there is no 'genuine issue for trial.'"  <u>Id.</u> at 587 (quoting <u>First Nat'l Bank</u>, 391

23   U.S. at 289).

24       **C.    Analysis**

25           **1.    Equal Protection**

26       Plaintiff first alleges that defendant violated his equal protection rights by subjecting

27   plaintiff to a modified program based solely on his race.

28       "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment

1    from invidious discrimination based on race." Wolff v. McDonnell, 418 U.S. 539, 556 (1974)

2    (citation omitted). Invidious racial discrimination such as racial segregation, which is

3    unconstitutional outside prisons, also is unconstitutional within prisons. Johnson v. California,

4    543 U.S. 499, 505–06 (2005). A prison classification based on race is immediately suspect and is

5    subject to the same strict scrutiny as a racial classification outside prison. Id. at 508-10. Prison

6    officials must therefore demonstrate that the race-based policy or action is narrowly tailored to

7    serve a compelling state interest. Id. at 510-11; Richardson v. Runnels, 594 F.3d 666, 671 (9th

8    Cir. 2010) (applying Johnson to racial lockdowns in response to prison disturbances).

9          Johnson did not rule out race-based classifications and did not eliminate prison security as

10   a reason for such classifications.  However, Johnson determined that prison officials must

11   demonstrate that race-based policies are narrowly tailored to address a compelling government

12   interest such as prison security. See Johnson, 543 U.S. at 511-13, 515 (remanding case for

13   determination of whether Department of Corrections' policy of temporarily segregating inmates

14   by race when they arrive in the prison system initially or are transferred to a new prison is

15   narrowly tailored to serve a compelling state interest).

16         Plaintiff moves for summary judgment and opposes defendant's cross-motion for

17   summary judgment on the ground that race-based lockdowns violate a May 13, 2009, order issued

18   from the Solano County Superior Court in In re the Application of Marcellious Tucker, Case No.

19   FCR233502. Pl.'s Mot. Summ. J. Ex. K. He also argues that race-based lockdowns are

20   categorically prohibited pursuant to Johnson absent a "social emergency." Each of these

21   arguments will be addressed herein.

22             **a.**     **State Court Order**

23         In re Tucker concerned a CSP-Solano Black inmate who filed a habeas petition

24   challenging the prison's race-based lockdowns in June 2005, November 2005, and May 2006.

25   The judge in that case determined that the prison's then-existing race-based policy for releasing

26   inmates from a modified program violated the respondent's constitutional rights because it was

27   not as narrowly tailored as it could be. That determination was made in light of a new policy that

28   was implemented in 2007 and that incorporated a more individualized assessment of each

inmate's risk of violence. In re Tucker is inapplicable here as it concerns an older policy that the superior court expressly acknowledged had since been updated as of the time that order issued, which was well over one year before the incident at issue in this case.

### b.     "Social Emergency"

Plaintiff next argues that defendant's consideration of race during the modified program was impermissible absent a "social emergency." This assertion appears to be based on a misreading of the following passage in Johnson:

> We did not relax the standard of review for racial classifications in prison in Lee v. Washington, 390 U.S. 333 (1968)] and we refuse to do so today. Rather, we explicitly reaffirm what we implicitly held in Lee: The "necessities of prison security and discipline," 390 U.S., at 334, 88 S. Ct. 994, are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities. See Grutter, 539 U.S., at 353, 123 S. Ct. 2325 (THOMAS, J., concurring in part and dissenting in part) (citing Lee for the principle that "protecting prisoners from violence might justify narrowly tailored racial discrimination"); J.A. Croson Co., 488 U.S., at 521, 109 S. Ct. 706 (SCALIA, J., concurring in judgment) (citing Lee for the proposition that "only a social emergency rising to the level of imminent danger to life and limb-for example, a prison race riot, requiring temporary segregation of inmates-can justify an exception to the principle embodied in the Fourteenth Amendment that '[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens'" (quoting Plessy v. Ferguson, 163 U.S. 537, 559, 16 S. Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting))); see also Pell, 417 U.S., at 823, 94 S. Ct. 2800 ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves").

543 U.S. at 512-13. Johnson neither issued a categorical prohibition against prison classifications based on race nor limited its use to social emergencies. Rather, it held that a race-based policy may be based on prison security and discipline so long as the policy is narrowly tailored. *One* situation where these government interests are at stake is during a social emergency, such as a prison race riot. Johnson, however, did not limit all use of race-based policies to social emergencies.

The dispositive questions in this case are whether defendant's consideration of race during the July 2010 modified program advanced a compelling government interest and was narrowly tailored.

14

### i.      Compelling Government Interest

As to the first factor, defendant produced evidence that the modified program was based on legitimate prison goals of security and safety. The investigation into the July 2010 incident, in which a Black correctional officer was assaulted by White skin heads, raised concerns about race-based violence, including a coordinated attack by White inmates and/or a retaliatory attack by Black inmates. Further supporting defendant's concern about race-based violence was the involvement of more than one White inmate, again suggesting a coordinated attack. As a result, defendant subjected White inmates to the modified program pending further investigation.

Plaintiff maintains that there was no real threat following the July 11, 2010, incident, either by him specifically or White inmates in general. But even if defendant was ultimately mistaken about the cause of the incident or the number of White inmates who were involved in the assault on the Black officer, plaintiff has not refuted defendant's explanation for the decision to segregate.

Plaintiff also disputes defendant's claim that lockdowns are never based solely on race or ethnicity. He points to evidence suggesting that race was indeed the only factor considered by defendant in targeting White inmates, including the program status reports, the administrative responses to plaintiff's grievance, and defendant's statements in this litigation. Plaintiff, however, is suggesting once again that the defendant's use of race violated Johnson's prohibition against race-based policies. As previously discussed, this argument is premised on a misreading of Johnson since that case did not issue a categorical prohibition against the consideration of race. Moreover, the evidence reveals that, in fact, not all White inmates were affected by the modified program. For example, defendant also considered the location of the inmates; those White inmates housed in Facilities I and II were subject to the modified program while the White inmates in Facilities III and IV were not.

### ii.      Narrowly Tailored

Likewise, defendant has met his burden of showing that the modified program was narrowly tailored to combat the threat of race-based violence. He submitted evidence that, as additional information was gathered, White inmates were slowly released, which allowed

15

correctional staff to monitor the reintegration of White inmates in controlled settings. Once it was deemed safe to do so, all inmates were released from the modified program.  Defendant has thus submitted adequate evidence that the modified program did not last longer than deemed necessary based on the risks.

Even though plaintiff may not have been involved in the incident nor an active member of any gang, defendant produced evidence that even non-affiliated inmates were at risk, such as during the reintegration attempts where non-affiliated White inmates were released with Black inmates. The result was inmate-on-inmate violence regardless of the gang affiliation or lack thereof. Plaintiff has submitted no evidence that he was held any longer than necessary, such as after the threat of racial violence had passed. He thus has not identified a genuine issue on the material question of whether the segregation was narrowly tailored to secure the safety of inmates and correctional staff. For these reasons, summary judgment is appropriate for defendant.

Plaintiff makes a related argument concerning defendant's alleged failure to comply with California Code of Regulations, tit. 15 § 3383, which directs that certain procedural requirements be met in a state of emergency. Pursuant to §3383(a),

> A state of emergency shall exist when the institution head or regional parole administrator/deputy director, Division of Adult Parole Operations (DAPO), temporarily suspends any nonessential operation, procedure, service or function, and the normal time limits or schedules for such activity in order to prevent, contain or control a disturbance.

Defendant rightly argues that this provision is inapplicable to plaintiff's claims since it relates to only these three instances, none of which was present in this case:

> (1) A lockdown or modified program of all housing units/sub-facilities within a facility's security perimeter is to exceed 24 hours.

> (2) A lockdown or modified program of fewer than all housing units/sub-facilities within a facility's security perimeter is to exceed 72 hours.

> (3) The suspension of a facility's major program or operation is to exceed 72 hours; e.g., an academic or Career Technical Education program, visiting program, yard operation, or dining room operation.

The July 2010 modified program did not include a lockdown "of all housing units" since it

16

1    specifically excluded Facilities III and IV; "of fewer than all housing units" for more than 72

2    hours since the lockdown on Facilities I and II did not exceed 72 hours; or the suspension of a

3    major program for more than 72 hours. Moreover, a violation of a prison regulation, which is not

4    itself challenged as unconstitutional, does not provide a basis for liability. Sandin, 515 U.S. at

5    481-82 (a "prison regulation [is] primarily designed to guide correctional officials in the

6    administration of a prison" and is "not designed to confer rights on inmates....").

7                    **2.      Due Process**

8            Insofar as plaintiff claims that he was denied due process before or during the lockdown,

9    the Ninth Circuit Court of Appeals has made clear that prisoners are not entitled to such

10   procedural due process rights if there is a state of emergency at the prison. See Hayward v.

11   Procunier, 629 F.2d 599 (9th Cir. 1980). In Hayward, prisoners of the East Block of San Quentin

12   State Prison filed a civil rights action claiming they were entitled procedural due process in

13   connection with a five-month prison lockdown. Id. They urged that a lockdown lasting more than

14   a short time without notice and a hearing of some sort deprived them of a protected liberty

15   interest. Id. at 601.

16           The Ninth Circuit rejected that argument, holding that the prisoners had no due process

17   right to a hearing during their five-month lockdown in light of the state of emergency that had

18   existed at the prison. Hayward, 629 F.2d at 603. The Ninth Circuit noted that between 1970 and

19   1974, the rate of violence at San Quentin State Prison had more than tripled, and that prison

20   officials responded by locking down the prison several times. Id. at 600. The Ninth Circuit

21   explained that the prisoners were not "being subjected to treatment wholly outside the foreseeable

22   consequences of criminal conviction, such as commitment to a mental institution in the absence

23   of a mental disease or defect." Id. at 601-02. The court emphasized that in cases where prisoners

24   are entitled to a due process hearing, the subject of the hearing was the fate of an individual

25   prisoner and his conduct or conditions. Id. at 602 (citing Wolff v. McDonnell, 418 U.S. 539

26   (1974)). In contrast, in Hayward the court observed that, "the question to be decided is whether

27   the degree of emergency justifies a continuation of the lockdown—a determination involving a

28   high degree of policy and prediction." Id.

Although the Ninth Circuit decided Hayward before the Supreme Court decided Sandin v. Connor, 515 U.S. 472 (1995), which altered the methodology for evaluating procedural due process claims brought by prisoners, Hayward is still good law. As another California district court recently explained in a decision rejecting a prisoner's due process claim challenging his modified programming:

> First, Hayward has not been overruled, and it has been applied post Sandin in cases raising due process claims.
>
> Second, Hayward's conclusion that the increased security represented by a lockdown is a "foreseeable consequence of a criminal conviction" indicates that a modified program in response to assaults by inmates on staff and other inmates, even one lasting for a few months, is not an atypical and significant hardship relative to the ordinary incidents of prison life.
>
> Third, Sandin receded from the due process methodology of Hewitt v. Helms, 459 U.S. 460, 103 S. Ct. 864, 74 L.Ed.2d 675 (1983) in part because "the Hewitt approach" had "led to the involvement of federal courts in the day-to-day management of prisons," which ran "counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." To counteract this "undesirable effect," the Sandin Court "return[ed] to the due process principles" reflected in Wolff and Meachum v. Fano, 427 U.S. 215, 96 S. Ct. 2532, 49 L.Ed.2d 451 (1976).
>
> Consistent with the due process principles later articulated in Sandin, the Ninth Circuit relied on Wolff and Meachum to support its due process analysis in Hayward, and it also took into account the need to afford deference to prison officials in making decisions respecting the continuance of lockdown and the pace of return to normal operations.
>
> Finally, Sandin did not invalidate the distinction that the Ninth Circuit drew in Hayward between a lockdown imposed on a group of inmates in response to inmate assaults and an individualized disciplinary determination affecting a particular inmate's conditions of confinement.

Hernandez v. Cate, 918 F. Supp. 2d 987, 1013-14 (C.D. Cal. 2013) (internal citations omitted).

In considering defendant's motion for summary judgment with respect to plaintiff's due process claim, the court is required to believe plaintiff's evidence and draw all reasonable inferences from the facts before the court in his favor. Drawing all reasonable inferences from that evidence in plaintiff's favor, the court finds that plaintiff has failed to submit sufficient evidence to create a genuine issue of material fact with respect to his claim that he had a protected

1   liberty interest in avoiding his challenged confinement.  Specifically, plaintiff has failed to

2   establish that he was subjected to anything more than modified, albeit harsher, programming.

3        Following the decision in Hayward, district courts in the Ninth Circuit have consistently

4   held that subjecting specific groups of prisoners to lockdowns or harsher modified programs does

5   not require prison officials to provide those specific groups of prisoners with procedural due

6   process protections.

7        Thus, in Corona v. Harrington, No. 08-cv-0237 LJO DLB, 2010 WL 318555 (E.D. Cal.

8   Jan. 20, 2010), the plaintiffs were general population cellmates in Building 5 at Kern Valley State

9   Prison with the highest privilege group classification. Id. at *1.  After a staff attack in May 2006,

10  which plaintiffs were not involved in, prison officials placed Buildings 1-8 on a lockdown and

11  interviewed all inmates regardless of ethnicity or gang affiliation. Id. Prison officials placed the

12  inmates actually involved in the attack in administrative segregation. Id.  In June 2006, prison

13  officials concluded that the attack involved only Southern Hispanics or Mexican Nationals and

14  kept the Hispanic inmates on lockdown but allowed Black, White, and "Other" inmates to return

15  to normal programming with restoration of all privileges.  Id. at *2.

16       Prison officials also allowed Hispanic inmates assigned to the substance abuse program in

17  Building 5 and age 35 and older (not plaintiffs) to return to normal privileges.  Id.  By September

18  2006, prison officials had allowed all inmates except Southern Hispanic inmates to return to

19  normal programming because additional incidents involving Southern Hispanics had taken place.

20  Id.  At that point, prison officials also moved plaintiffs from Building 5 to Building 9.  Id.  In

21  October 2006, the warden approved dayroom access, telephone calls, and a normal shower

22  program for Southern Hispanics in Buildings 1-4 but kept Southern Hispanics in Buildings 6-8,

23  including plaintiffs, on more restrictive programs.  Id.  Effective November 2006, prison officials

24  lifted the lockdown and allowed all Southern Hispanics to return to normal program.  Id. at *3.

25  The plaintiffs filed a civil rights action in which they claimed that they had been deprived of a

26  protected liberty interests without due process of law because they did not receive a hearing or

27  other individualized determination prior to or during defendants' subjecting them to the modified

28  programming.  Id. at *3.

1    Relying on the Ninth Circuit's decision in Hayward, the court held that the key to

2  plaintiffs' due process claim was whether the degree of emergency justified continuation of the

3  lockdown. See Corona, 2010 WL 318555 at *9.  In rejecting plaintiffs' due process claim, the

4  court explained:

> The procedural due process claim rests on the conclusory claim that
> no emergency existed to justify a five-month lockdown.  Plaintiffs
> do not appear to contest the initial lockdown based on the staff
> attack.  They appear to contest the continuation of lockdown of
> Hispanic inmates under age 35.  As noted above, the continued
> lockdown applied to a limited prison population and not to
> Hispanics as a whole.  Plaintiffs themselves refer to the lockdown
> inmates as a "sub-group."  Decisions to maintain the lockdown for
> the sub-group "is not a disciplinary measure, but an administrative
> strategy designed to preserve order in the prison and protect the
> safety of all inmates" as well as staff.  The maintenance of the
> lockdown for the "sub-group" is akin to assigning suspected gang
> affiliates to particular prison housing units which "is essentially a
> matter of administrative discretion."  In the absence of challenge to
> their Southern Hispanic affiliation, the FAC fails to establish a
> procedural due process violation for the continued lockdown of
> Hispanic inmates under age 35.

14  Corona, 2010 WL 318555 at *9.  See also Mitchell, 2014 WL 4081763 at *8 ("This analysis does

15  not turn on the fact that the lockdown at issue in Hayward was institution-wide.  It applies equally

16  to the collective lock-down of inmates in a particular unit of a prison.").

17    In Negrete v. Lewis, No. C 11-3436 RS (PR), 2012 WL 4903001 (N.D. Cal. Oct. 16,

18  2012), aff'd 585 Fed. Appx. 364 (9th Cir. Oct. 7, 2014), another California district court has

19  rejected a similar due process claim brought by a prisoner in connection with lockdowns and

20  modified programming with respect to two rival prison gangs.  In that case two violent incidents

21  had occurred at Pelican Bay State Prison between inmates of the Northern Hispanic and Southern

22  Hispanic gangs.  Id. at *1.  Prison officials implemented lockdowns and modified programs

23  designed to separate the two gangs.  Id.  Further violence between the two gangs thwarted efforts

24  to terminate the restrictive programming.  Id.  Plaintiff transferred into the prison, and prison

25  officials classified him as a Southern Hispanic inmate and immediately subjected him to the

26  modified program.  Id.  The plaintiff claimed that defendants violated his right to due process by

27  placing him on constant lockdown or modified programming for almost two years.  Id.  The court

28  held that the plaintiff had not shown a triable issue of material fact with respect to his due process

1    claim.  Id. at *3.  In so holding, the court explained as follows:

2            Although plaintiff did not directly participate in the incidents, his
             conduct is not at issue.  What is at issue is whether the degree of
3            emergency justified a continuation of the lockdown.  The
             undisputed facts in the record show that before plaintiff arrived at
4            Pelican Bay and during plaintiff's stay, there were a number of
             incidents between the Northern Hispanic and Southern Hispanic
5            inmates.  Although plaintiff described them as "small incidents," he
             nonetheless characterized some of them as assaults or riots.
6            Because prison officials must maintain the safety of inmates, it was
             reasonable to implement lockdowns to separate Northern and
7            Southern Hispanic inmates after the assaults.  Here, the captain of
             Facility B stated that lockdowns and modified programs were
8            implemented initially in response to a violent incident that occurred
             in August 2008 at Facility B's main exercise yard.  The fact that
9            more violence occurred after the initial incident in 2008 tends to
             support the idea that the lockdowns were a necessary response in
10           order to maintain prisoners' safety during that time ….  Because the
             lockdowns were in response to a genuine emergency and were not
11           used as punishment, plaintiff was not owed procedural due process
             in the form of a hearing or otherwise before being locked down.
12

13   Id. at *3.

14           Another California district court has rejected a similar claim by Muslim inmates who

15   maintained that prison officials denied them their right to due process when they implemented

16   modified programming without providing the inmates advance notice or an opportunity for a

17   hearing.  See Robins v. Lamarque, No. C 02-4720 JF (PR), 2008 WL 744816 at *4 (N.D. Cal.

18   Mar. 18, 2008).  In Robins, the plaintiff was housed in Facility D, a maximum-security housing

19   unit for prisoners requiring the highest security custody.  Id. at 1. On October 5, 2001, prison

20   officials informed Muslim inmates that they were being placed on a modified program and

21   restricted to their cells because prison officials had learned of a plan by Muslim inmates to attack

22   prison staff.  Id. In that case the district court granted summary judgment to the defendants,

23   concluding that plaintiff's due process claim failed as a matter of law and explaining as follows:

24           In light of the undisputed evidence concerning threats of violence
             by Muslim inmates, there is no genuine issue of material fact as to
25           whether the inmates had a liberty interest that triggered a right to
             notice. Moreover, it is clear that Plaintiff knew that the modified
26           program had been initiated, as shown by the fact that he filed an
             administrative grievance on October 14, 2001, only nine days after
27           the modified program was put in place.  Prison officials responded
             to the grievance in November 2001 and interviewed Plaintiff after
28           he appealed to the Second Level of Review.  Prison staff also

                                        21

responded to Plaintiff's separate appeal as a member of a group of
inmates who filed a grievance in October 2001.

Id. at 5.

Similarly, in the present case the evidence fails to create a triable issue of fact with respect

to whether defendant's decision to implement and continue the July 2010 modified program was

warranted in light of the assault on a Black staff member by two White inmates. See Hayward,

629 F.2d at 602 (the question is whether the degree of emergency justified the continued

lockdown); see also Furnace v. Evans, No. 06-cv-4229 MMC (PR), 2009 WL 2511967 at *16

(N.D. Cal. Aug. 14, 2009) (granting summary judgment in favor of defendants because plaintiff

failed to raise a triable issue of fact with respect to whether prison officials reasonably determined

that prison conditions warranted the implementation and continuation of a modified program),

aff'd in relevant part 459 Fed. Appx. 630, at *1 (9th Cir. Nov. 23, 2011).

Accordingly, for all of the reasons set forth above, the undersigned concludes that

judgment should be entered for defendant on plaintiff's due process claim.

### 3.    Outdoor Exercise

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

Const. amend. VIII.  The "unnecessary and wanton infliction of pain" constitutes cruel and

unusual punishment prohibited by the United States Constitution.  Whitley v. Albers, 475 U.S.

312, 319 (1986).  To prevail on an Eighth Amendment claim, the plaintiff must show, objectively,

that he suffered a "sufficiently serious" deprivation.  Farmer v. Brennan, 511 U.S. 825, 834

(1994); Wilson v. Seiter, 501 U.S. 294, 298–99 (1991).  The plaintiff must also show that each

defendant had, subjectively, a culpable state of mind in causing or allowing plaintiff's deprivation

to occur.  Farmer, 511 U.S. at 834.

The Ninth Circuit has clarified the elements necessary to state a deprivation that rises to

the level of an Eighth Amendment violation:

> An Eighth Amendment claim that a prison official has deprived
> inmates of humane conditions must meet two requirements, one
> objective and one subjective. Allen v. Sakai, 48 F.3d 1082, 1087
> (9th Cir. 1995). "Under the objective requirement, the prison
> official's acts or omissions must deprive an inmate of the minimal
> civilized measure of life's necessities. The subjective requirement,

22

relating to the defendant's state of mind, requires deliberate indifference." Id. (citations omitted).

Lopez v. Smith, 203 F.3d 1122, 1132–33 (9th Cir. 2000).  Determining "deliberate indifference" is a two-part inquiry.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (citing Farmer, 511 U.S. at 834).  First, the inmate must show that the prison officials were aware of a "substantial risk of serious harm" to an inmate's health or safety.  Id.  Second, the inmate must show that the prison officials had no "reasonable" justification for the deprivations, in spite of that risk. Farmer, 511 U.S. at 844 ("Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably.");  Thomas, 611 F.3d at 1150.

Outdoor exercise is a basic human need protected by the Eighth Amendment, and the denial of outdoor exercise may violate the Constitution, depending on the circumstances. Richardson v. Runnels, 594 F.3d 666 (9th Cir. 2010); Norwood v. Vance, 591 F.3d 1062, 1070 (9th Cir. 2010).  When an inmate alleges the denial of constitutionally adequate outdoor exercise, the inquiry is fact specific. In determining whether a deprivation of outdoor exercise is sufficiently serious, the court must consider the circumstances, nature, and duration of the deprivation.  Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979).

"[T]he Ninth Circuit has not identified a specific minimum amount of weekly exercise that must be afforded" under the Eighth Amendment.  Jayne v. Bosenko, No. 2:08-cv-2767 MSB, 2009 WL 4281995, at *8 (E.D. Cal. Nov. 23, 2009) (citation omitted).  Indeed, complete denial of outdoor exercise for a month may not be unconstitutional.  Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir. 1980) (denial of yard time for a month not unconstitutional); May v. Baldwin, 109 F.3d 557, 565–66 (9th Cir. 1997) (denial of yard time for 21 days not unconstitutional). However, in Lopez, the Ninth Circuit found that plaintiff's claim that he was denied all outdoor exercise for six and a half weeks met the objective requirement for an Eighth Amendment claim. 203 F.3d at 1132–33.

The Ninth Circuit has distinguished between "temporary" denials of outdoor exercise and "long-term" denials.  For a temporary denial of exercise to be actionable, plaintiff must

1    demonstrate an adverse medical impact.  Lopez, 203 F.3d at 1133 n.15.  A long-term deprivation

2    is considered substantial regardless of its effects.  Id.; see also Norwood, 591 F.3d at 1070.  The

3    21-day denial of yard time in May met the definition of a "temporary" deprivation, while the six-

4    week denial of yard time considered in Lopez was a "long-term" deprivation.  See Lopez, 203

5    F.3d at 1133 n.15.

6        The facts in this case demonstrate that plaintiff was deprived of outdoor exercise for

7    approximately 30 days during the July 2010 modified program. Plaintiff claims this denial

8    violated his Eighth Amendment rights, though he does not claim that this deprivation resulted in

9    an adverse medical impact. Even if this denial amounts to a long-term denial, Norwood held that

10    such deprivations of exercise are permissible if necessary for security reasons, 591 F.3d at 1065,

11    and defendant maintains that security concerns necessitated the 30-day modified program.

12        The Ninth Circuit has made clear that "prison officials are entitled to 'wide-ranging

13    deference' and that the courts must defer to prison officials' judgment as long as it does not

14    manifest deliberate indifference or an intent to inflict harm." Gomez v. McDonald, No. 2:11-cv-

15    659-KJM-DAD, 2015 WL 5435256, at *38 (E.D. Cal. Sept. 15, 2015) (quoting Noble v. Adams,

16    646 F.3d 1138, 1143 (9th Cir. 2011)).

17        Here, there is no evidence that defendant's decision to confine plaintiff to his cell without

18    exercise was deliberately indifferent or intended to inflict harm. After a violent incident,

19    defendant concluded that it was necessary to do so for the safety of staff and inmates. Plaintiff has

20    provided no evidence to suggest that defendant's conclusion was in any way unreasonable or

21    impermissible. There is no evidence that plaintiff's 30-day confinement "was in excess of what

22    was required to restore order, was unrelated to the officials' security and safety responsibilities,

23    and was kept in effect for a longer period than necessary." Noble, 646 F.3d at 1148. The

24    undersigned therefore concludes that plaintiff's 30-day deprivation of exercise did not violate the

25    Eighth Amendment.

26        In light of the above recommendations, the undersigned declines to consider defendant's

27    alternative argument that he is entitled to qualified immunity. The undersigned also declines to

28    consider additional claims asserted by plaintiff in his motion for summary judgment, which

include loss of privacy in violation of the Fourth Amendment and denial of access to religious services in violation of the First Amendment. This is because these claims either cannot be fairly encompassed by the allegations asserted in the complaint or are already incorporated in the claims addressed herein.

**VI.      Conclusion**

Based on the foregoing, IT IS HEREBY ORDERED that plaintiff's motion to have matter deemed admitted (ECF No. 23) is denied; and

IT IS HEREBY RECOMMENDED that:

A.  Plaintiff's motion for summary judgment (ECF No. 25) be DENIED;

B.  Defendant's motion for summary judgment (ECF No. 27) be GRANTED:

    a.  Plaintiff's claims as to the February 2011 modified program be dismissed for failure to exhaust administrative remedies; and

    b.  Judgment be entered for defendant on all of plaintiff's claims related to the July 2010 modified program;

C.  The Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.

////

////

////

////

////

////

////

Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 8, 2017

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

/DLB7;
DB/Inbox/Substantive/edwa2218.msj.v2

26