1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DAVID EDWARDS,                                     No.  2:13-cv-02218 DJC DB P

12                  Plaintiff,

13          v.                                          FINDINGS & RECOMMENDATIONS

14   SWARTHOUT, Warden,

15                  Defendant.

16

17

18          David Edwards, a state inmate now proceeding through counsel, brought this suit under 42

19   U.S.C. § 1983. In his sole remaining claim, plaintiff alleges defendant, Warden Gary Swarthout,

20   violated his constitutional rights by temporarily imposing restrictions on White inmates in July

21   2010 at California State Prison in Solano, California ("CSP-Solano"). The parties' supplemental

22   briefs on defendant's arguments for claim preclusion and qualified immunity are before the court.

23   (ECF Nos. 58, 61, 62.)

24          Defendant has not met his burden to show he is entitled to summary judgment on either

25   asserted supplemental ground. Even if the court applied the forfeited claim preclusion defense,

26   defendant fails to establish claim preclusion. In addition, defendant is not entitled to qualified

27   immunity from suit. Accordingly, defendant's supplemental grounds for granting summary

28   judgment should be denied.

1

1    **I.     Background**

2          On July 11, 2010, a Black correctional officer was seriously injured on the main kitchen

3    back dock between Facilities I and II at CSP-Solano. (ECF No. 27-1 at ¶ 18.) As a result of this

4    incident, inmates in these facilities were placed on a modified program pending further

5    investigation. (Id.) On September 2, 2011, plaintiff filed a complaint in the Solano County

6    Superior Court, challenging the 2010 modified program at CSP-Solano, and naming CSP-Solano

7    and Warden Swarthout in his official capacity. (See ECF No. 27-8 at 10.)

8          In February of 2011, another modified program was put in place at CSP-Solano. (See ECF

9    No. 27-8 at 10.) In May of 2012, plaintiff filed a second amended complaint in the superior court

10   alleging constitutional violations with respect to both the 2010 modified program and the 2011

11   modified program. (See id.)

12         On September 21, 2012, the superior court sustained defendants' demurrer to the second

13   amended complaint without leave to amend. (ECF No. 27-8 at 13.) On June 27, 2013, the

14   California Court of Appeal for the First Appellate District affirmed the judgment in favor of the

15   CSP-Solano defendants. (Id. at 17.) The state court of appeal held the "superior court properly

16   sustained the demurrer and denied leave to amend based on defendants' immunity from civil

17   liability for plaintiff's claims." (Id. at 10.)

18         On October 23, 2013, plaintiff initiated this federal action with a pro se complaint,

19   bringing equal protection and due process claims against Warden Swarthout in his individual

20   capacity based on defendant's implementation of the two modified programs. (ECF No. 1.) In

21   2015, the parties filed cross-motions for summary judgment. (ECF Nos. 25, 27.)

22         The undersigned issued findings and recommendations (ECF No. 33), and on April 20,

23   2017, the assigned district judge then-presiding denied plaintiff's motion for summary judgment

24   and granted defendant's motion for summary judgment. (ECF No. 37.) The court dismissed

25   plaintiff's claims as to the February 2011 modified program for failure to exhaust administrative

26   remedies and entered judgment for defendant on plaintiff's claims related to the July 2010

27   modified program. (Id.) Plaintiff appealed to the United States Court of Appeals for the Ninth

28   Circuit. (ECF Nos. 39, 40.)

On February 18, 2022, the Ninth Circuit vacated the judgment, in part,[1] and remanded for further proceedings only on the equal protection claim related to the July 2010 modified program, holding as follows:

> The district court improperly granted summary judgment on Edwards's equal protection claim. An "express racial classification," like the one here, "is immediately suspect" and subject to strict scrutiny. *Johnson v. California*, 543 U.S. 499, 509 (2005). Swarthout was therefore required to "demonstrate that any race-based policies are narrowly tailored" to "address the compelling interest in prison safety." *Id.* at 514. That is, Swarthout "had to show that reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals)." *Richardson v. Runnels*, 594 F.3d 666, 671 (9th Cir. 2010) (as amended).
>
> Swarthout presented insufficient evidence to establish a link between the individuals who perpetrated the incidents at issue and the risk of violence from all white inmates. Swarthout's statement in his declaration that other white inmates could "potentially" have been involved in the incident does not constitute evidence of a linkage between the two white inmates who perpetrated the assault and all other white inmates. *See id.* at 671–72 (concluding that it was insufficient "for prison officials simply to believe there to be a link between an individual incident perpetrated by one or two inmates, and the risk of violence from all the [prisoners of one race] in Facility D, with no evidentiary basis whatever indicated for that belief"). Therefore, Swarthout did not carry his burden for summary judgment on Edwards's equal protection claim. We decline to reach qualified immunity because the issue was not addressed by the district court. *See id*. at 672.
>
> We therefore vacate the judgment in part and remand for further proceedings on the equal protection claim only. On remand, the district court may consider alternate bases for summary judgment and order supplemental briefing.

(ECF No. 42 at 3-4.) The Ninth Circuit further noted as follows:

> We decline to consider Swarthout's argument that Edwards's claims are barred by claim preclusion, as he did not raise that argument before the district court and the district court did not consider it. <u>See CarePartners, LLC v. Lashway</u>, 545 F.3d 867, 879 n.8 (9th Cir.

---

[1] As to the February 2011, modified program, the Ninth Circuit held "[t]he district court properly granted summary judgment on Edwards's claims related to the February 2011 restrictions because Edwards did not exhaust available administrative remedies and failed to raise a genuine dispute of material fact as to whether administrative remedies were effectively unavailable to him." (ECF No. 42 at 2.)

2008); <u>Peterson v. Highland Music, Inc.</u>, 140 F.3d 1313, 1321 (9th Cir. 1998) (as amended).

(<u>Id.</u> at 2 n.1.) The mandate issued on April 12, 2022. (ECF No. 43.)

On November 2, 2022, the court ordered the parties to submit supplemental briefing addressing whether defendant is entitled to summary judgment on the remaining equal protection claim. (ECF No. 57.) "To the extent that any arguments are raised by defendant that were not previously contained in defendant's initial motion for summary judgment[,]" the court instructed, the "parties should address if the court can properly consider these new arguments including whether those grounds have been waived." (ECF No. 57 at 2.)

On December 16, 2022, defendant filed his supplemental brief. (ECF 58.) Defendant argues, first, the court should consider his claim preclusion defense—raised for the first time on appeal—in order to avoid inconsistent results and to advance judicial economy. (ECF No. 58 at 9-10.) Defendant argues, second, California's claim preclusion doctrine precludes litigation of the equal protection claim because plaintiff already litigated the same injury on the merits in state court to a final judgment. (<u>Id.</u> at 10-13.) Defendant argues, third, he is entitled to qualified immunity because it was not clearly established in 2010 that a modified program based partly on race violated the constitution. (<u>Id.</u> at 13-15.)

Plaintiff filed a response to the supplemental brief on January 30, 2023. (ECF No. 60.) On March 1, 2023, defendant filed a reply. (ECF No. 61.)

## II.     Undisputed Facts Regarding the July 2010 Modified Program

Plaintiff is an unaffiliated White inmate who was housed at CSP-Solano at all relevant times. (Def.'s Statement of Undisputed Facts ("DSUF") 1-2, <u>see</u> ECF No. 27-2.) As the Warden of CSP-Solano, defendant Swarthout approved the Program Status Report at issue here: PSR No. SOL-July-11-10-027. (DSUF 4.)

### A.     Race, Prison Violence, and Modified Program

#### 1.     Modified Program Overview

CSP-Solano is a Level III institution that houses violent felons. (DSUF 5.) In order to ensure the safety of all inmates after a serious incident, prison officials may modify or restrict

4

program activities for some or all inmates by implementing a modified program affecting all or a portion of the inmate population. (DSUF 8.)

During a modified program, regular institutional programming is interrupted. (DSUF 9.) Affected inmates are not allowed out of their cells without being escorted. (DSUF 9.) Escorts often have further restrictions including additional mechanical restraints or additional officers. (DSUF 9.) All support programs for inmates, including educational programs, prison jobs, religious services, visitation, access to the law library, and group mental health, among others, may be restricted or unavailable. (DSUF 9.) Restrictions are continually evaluated and subsequently modified to allow access as soon as it is deemed safe to do so. (DSUF 9.)

### 2.    Race as a Factor

Race (or ethnicity) is one of the factors that can cause violence. (DSUF 6.) Inmates often segregate themselves by race, and within the various racial groups of inmates there are sub-groups of gangs or disruptive groups, such as the White Skin Heads, Black Guerilla Family, Mexican Mafia, Southern Hispanics, Bloods, Crips, etc. (DSUF 6.) Even inmates who are not affiliated with a gang or disruptive group sometimes join in or sympathize with members of their racial group, and gang members often pressure unaffiliated inmates of the same race to participate in violent activities. (DSUF 7.) Incidents that begin without racial animus often evolve into racial conflict. (DSUF 7.)  For instance, a fight between two inmates of different races that had nothing to do with race initially may erupt into a race riot. (DSUF 7.)

Under the California Department of Corrections and Rehabilitation's ("CDCR") policy at the relevant time, inmates' race and ethnicity could be a factor considered in determining the scope of a modified program. (DSUF 8.) In addition, a process of elimination was used to rule out potential gang and/or disruptive groups, personal issues, and/or possible retaliation issues. (DSUF 8.)

### 3.    Investigation and Return to Normal Programming

When a modified program is implemented, prison officials investigate to determine when normal programming can be safely resumed. (DSUF 10-11.) Striking the right balance between ensuring the safety and security of inmates, staff, and the institution on one hand, and returning

inmates to normal programming and regular exercise as soon as safely possible on the other, is difficult. (DSUF 16.)

Once prison officials determine that it is safe to do so, inmates are gradually returned to normal programming in phases, beginning, for example, with the incremental restoration of specified program activities. (DSUF 12.) The determination to return to normal programming is made based on the totality of circumstances, including the absence of information indicating potential for further violence. (DSUF 12.) If an incremental release is successful, more inmates and privileges are restored until all the inmates' privileges are restored. (DSUF 12.)

### B.      The July 2010 Modified Program

On July 11, 2010, a Black officer was found seriously injured on the main kitchen back dock between Facilities I and II. (DSUF 18.) The officer was found unconscious and appeared to have been assaulted. (DSUF 18.) The inmates working on the main kitchen back door were placed into administrative segregation pending investigation into their possible involvement. (DSUF 18.)

As a result of this incident, all inmates on Facilities I and II were placed on modified program pending further investigation. (DSUF 18.) As a result of the modified program, various restrictions were instituted, including one-to-one restrained escorts, unclothed body searches prior to escorts, cell feeding, no visits, no inmate workers, no showers, no legal library, no dayroom activities, no recreation yard, no canteen, no packages, no phone calls, and no religious services. (DSUF 22.)

Warden Swarthout immediately ordered interviews to be conducted of the inmates working on the main kitchen back dock at the time of the event, of the officer who was hurt, and of inmates of different races on Facilities I and II. (DSUF 21.) Following an investigation, it was determined that two of the inmates who were working the back dock were White Skin Heads who assaulted the officer, and these inmates were immediately transferred to another institution. (DSUF 19.) Although the perpetrators were identified, the cause of the assault had not yet been determined. (DSUF 19.) It was not yet determined whether the incident was personal, gang-related, or racially-motivated, or whether it was the result of an ordered hit with additional staff

6

potentially at risk. (DSUF 19.) Given these unknown factors, the severity of the assault, and that a Black officer was assaulted by White inmates, staff did not know whether further violence would occur due to tension between other White inmates and/or possible retaliation from Black inmates. (DSUF 19.)

Due to the direct involvement of two White inmates, the incident was determined to be "group related," as opposed to an isolated incident between two individual people. (DSUF 21.) It was further determined that this suggested other White inmates were possibly involved. (DSUF 21.)

On July 12, 2010, as investigations were ongoing, escorting for White inmates remained one-to-one but escorting for all other inmates was modified to five-to-one, meaning five inmates were escorted by only one officer. (DSUF 23.) This was because the attackers were identified as White inmates and it was determined that White inmates posed a greater security threat. (DSUF 23.)

On July 14, 2010, inmates in Facilities I and II were returned to normal programming, with the exception of White inmates, because the investigation had revealed the incident was confined to White inmates and did not involve inmates of other races. (DSUF 24.) By restricting those inmates who might initiate or be subjected to further violence, Warden Swarthout was trying to safeguard the safety and security of all inmates, staff, and the institution, while restricting the normal programming of the fewest number of inmates. (DSUF 24.) Restrictions of the modified program were further eased to allow showers three days a week and to allow chaplains to make rounds within the housing units. (DSUF 24.)

On July 23, 2010, as investigations continued, restrictions of the modified program were further eased to allow limited use of the legal library for inmates with approved court deadlines. (DSUF 25.) On August 5, 2010, restrictions were further eased to allow inmates to resume normal programming within their housing units and normal feeding in the facility dining hall. (DSUF 26.) This gradual resumption of normal programming allowed staff the opportunity to observe inmate interaction and behavior in small groups and in a controlled setting. (DSUF 26.)

////

By August 12, 2010, all inmates returned to normal programming. (DSUF 27.) The modified program at issue resulted in the denial of yard privileges to White inmates for approximately thirty days. (DSUF 27.)

## II.      Claim Preclusion

The court first takes up defendant's claim preclusion argument in the supplemental motion for summary judgment. "The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which.... commands a federal court to accept the rules chosen by the State from which the judgment is taken." Marrese v. Am. Academy of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985) California's res judicata doctrine includes two types of preclusion: claim preclusion and issue preclusion:[2]

> Claim preclusion "prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." Claim preclusion arises if a second suit involves: (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit. If claim preclusion is established, it operates to bar relitigation of the claim altogether.

> Issue preclusion prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action. [….] In accordance with due process, [issue preclusion] can be asserted only against a party to the first lawsuit, or one in privity with a party.

DKN Holdings LLC v. Faerber, 61 Cal. 4th 813, 824 (2015) (citations omitted). In DKN Holdings, the California Supreme Court further explained there has been ample confusion with the use of these terms:

> We have sometimes described "res judicata" as synonymous with claim preclusion, while reserving the term "collateral estoppel" for issue preclusion. On occasion, however, we have used the term "res judicata" more broadly, even in a case involving only issue preclusion, or collateral estoppel. We are not the only court to sometimes use the term "res judicata" with imprecision.

Id. (citations omitted).

--------

[2] Issue preclusion is not raised in this case but is referenced and discussed in the parties' arguments.

8

**1.     The Court has Authority to Forgive the Forfeiture**

The parties agree defendant forfeited the claim preclusion defense by not raising it earlier. (ECF No. 58 at 9; ECF No. 60 at 9.) <u>See</u> <u>Arizona v. California</u>, 530 U.S. 392, 410 (2000) ("res judicata [is] an affirmative defense ordinarily lost if not timely raised."); <u>Kern Oil & Ref. Co. v. Tenneco Oil Co.</u>, 840 F.2d 730, 735 (9th Cir. 1988) (res judicata defense raised belatedly after trial was waived). Defendant argues compelling considerations warrant consideration of the claim preclusion defense following the Ninth Circuit's remand of this case. (ECF No. 58 at 9-10.) Specifically, defendant argues, allowing the defense would avoid inconsistent results and advance judicial economy. (<u>Id.</u>)

Plaintiff argues the court should decline to consider an affirmative defense not raised in defendant's pleading. (ECF No. 60 at 10.) Plaintiff disputes defendant's argument that allowing defendant to raise claim preclusion would avoid inconsistent results and advance judicial economy in this instance. (<u>Id.</u> at 13.)

In reply, defendant argues the court should consider the defense because the Ninth Circuit "invited briefing on claim preclusion" when remanding plaintiff's equal protection claim. (ECF No. 61 at 3.) Defendant argues there is no prejudice to plaintiff based on the delay in raising the defense because the issue is a question of law and plaintiff knew he was "seeking a second bite at the same apple" when filing the present suit. (<u>Id.</u> at 3-6.)

The question whether defendant forfeited his res judicata defense by failing to plead it is governed by federal law. <u>Clements v. Airport Auth. of Washoe Cnty.</u>, 69 F.3d 321, 328 (9th Cir. 1995)). Both parties cite and rely on <u>Rodriguez v. City of San Jose</u>, 930 F.3d 1123 (9th Cir. 2019). (<u>See</u> ECF No. 58 at 9; ECF No. 60 at 10-11.)  In <u>Rodriguez</u>, the Ninth Circuit overlooked a forfeiture of issue preclusion and precluded relitigation of the plaintiff's argument that seizure and retention of her firearms violated her Second Amendment right. 930 F.3d at 1131. As to another claim brought under the Fourth Amendment, the Ninth Circuit noted "there is less reason to forgive waiver of claim preclusion than there is to forgive waiver of issue preclusion, so even if the Fourth Amendment argument could be viewed as part of the same claim… pursued in state court, we would decline to consider claim preclusion sua sponte." <u>Id.</u> at 1137 n. 13.

9

1   Plaintiff argues <u>Rodriguez</u> explained only issue preclusion prevents litigation of the same

2   matter twice to inconsistent results, which is why it is favored over claim preclusion. (ECF No. 60

3   at 10.) Defendant argues <u>Rodriguez</u> illustrates the court's authority to consider claim preclusion

4   even where not pleaded and raised for the first time on appeal. (ECF No. 61 at 2.)

5   The court has authority to forgive defendant's failure to plead the affirmative defense.

6   Because defendant has not met his burden to demonstrate the defense precludes the claim,

7   however, the undersigned will not recommend the court do so in this instance.  To that end, below

8   is an analysis of the merits of defendant's claim preclusion argument.

9   **B.   Claim Preclusion does not bar the Claim**

10   Under California law, "[c]laim preclusion arises if a second suit involves: (1) the same

11   cause of action (2) between the same parties (3) after a final judgment on the merits in the first

12   suit." <u>DKN Holdings</u>, 61 Cal.4th at 824. The party asserting preclusion bears the burden of

13   showing it applies. <u>See</u> <u>Lucido v. Superior Ct.</u>, 51 Cal. 3d 335, 337 (1990). The sole element

14   disputed by the parties in this case is whether the action is between the same parties as to Warden

15   Swarthout in his official capacity (first suit) and in his individual capacity (this case).

16   Plaintiff argues courts in this circuit have held a government actor in his official capacity

17   is not in privity with himself in his individual capacity for purposes of res judicata. (ECF No. 60

18   at 12.) <u>See, e.g.,</u> <u>Lull v. Cnty. of Placer</u>, No. 2:19-CV-02444-KJM-AC-PS, 2020 WL 1853017, at

19   *7 (E.D. Cal. Apr. 13, 2020) (collecting cases that have held "[a] government official in his

20   official capacity is not in privity with himself in his individual capacity for purposes of res

21   judicata."), report and recommendation adopted, No. 2:19-CV-02444-KJM-AC-PS, 2020 WL

22   7023954 (E.D. Cal. Nov. 30, 2020). Plaintiff argues the standard for claim preclusion under

23   California law "mirrors the federal standard." (ECF No. 60 at 12-13.)

24   Defendant responds that the cases advanced by plaintiff finding a lack of privity between

25   officials in their individual and official capacities arose first in a district court, and thus that the

26   subsequent federal courts were not bound by the Full Faith and Credit statute as this court is

27   bound here. (ECF No. 61 at 3-4.) Defendant argues privity exists based on vicarious and

28   derivative liability because California public entities are vicariously liable for the tortious acts and

10

1  omissions of their employees. (Id. at 5.) And further, "liability for the lawsuit against Swarthout

2  in his official capacity—in essence, a suit against the state, necessarily stems from his actions

3  taken as an individual administering California State Prison Solano[.]" (Id.) Therefore, defendant

4  argues, there is a sufficient shared community of interest to find privity. (Id.)

5      Defendant has identified a shared interest, but privity in this context requires the sharing

6  of "an identity or community of interest" with "adequate representation" of that interest in the

7  first suit, and circumstances such that the nonparty "should reasonably have expected to be

8  bound" by the first suit. See DKN Holdings, 61 Cal. 4th at 826 (distinguishing between derivative

9  liability and joint and several liability in the context of privity). A nonparty alleged to be in

10 privity must have an interest so similar to the party's interest that the party acted as the nonparty's

11 "virtual representative" in the first action. Id. (quoting Gottlieb v. Kest, 141 Cal.App.4th 110, 150

12 (2006)). "Whether someone is in privity with the actual parties requires close examination of the

13 circumstances of each case." Consumer Advoc. Grp., Inc. v. ExxonMobil Corp., 168 Cal. App.

14 4th 675, 689-90 (2nd Dist. 2008).

15     Defendant's argument for privity based on vicarious liability relies on cases that are not

16 persuasive to the facts of this case. (See ECF No. 61 at 5.) Defendant cites a case that decided

17 whether different individual defendants were in privity with each other, see Williams v. Price,

18 No. 1:18-CV-00102-NONE-SAB-PC, 2020 WL 4350089, at *9 (E.D. Cal. July 29, 2020), report

19 and recommendation adopted, No. 1:18-CV-00102-NONE-SAB-PC, 2020 WL 5891453 (E.D.

20 Cal. Oct. 5, 2020), and a case in which the issue was not reached, see Valson v. Cates, No. 1:14-

21 CV-01420-DAD-EPG, 2018 WL 6620341, at *7 (E.D. Cal. Dec. 18, 2018), subsequently aff'd

22 sub nom. Valson v. Kelso, 812 F. App'x 511 (9th Cir. 2020). "It is axiomatic that cases are not

23 authority for propositions not considered." Evanston Ins. Co. v. Atain Specialty Ins. Co., 254 F.

24 Supp. 3d 1150, 1165 (N.D. Cal. 2017) (quoting Canales v. City of Alviso, 3 Cal.3d 118, 128 n.2

25 (1970)).

26     According to the Restatement (Second) of Judgments, section 36(2), "[a] party appearing

27 in an action in one capacity, individual or representative, is not thereby bound by or entitled to the

28 benefits of the rules of res judicata in a subsequent action in which he appears in another

however, expressly address the differences between official capacity and individual capacity suits. At least one other district court in the Ninth Circuit has reached a contrary conclusion in a very similar context. See Torres v. Diaz, No. 1:14-CV-00492-DAD-SAB-PC, 2016 WL 4708489, at *2 (E.D. Cal. Sept. 8, 2016) (insofar as plaintiff has sued defendant Fernandez in his individual capacity, privity is not satisfied because plaintiff's state habeas petition only named Warden Connie Gipson in her official capacity).

Given the differences between official capacity suits and individual capacity suits, Warden Swarthout in his individual capacity did not have a "virtual representative" in plaintiff's prior state court action. Gottlieb, 141 Cal.App.4th at 150. Warden Swarthout in his official capacity successfully asserted an immunity defense in the prior state court action. (ECF No. 27-8 at 13.) The state court of appeal affirmed the judgment in his favor, holding the "superior court properly sustained the demurrer and denied leave to amend based on defendants' immunity from civil liability for plaintiff's claims." (Id. at 10.) Under these circumstances, defendant in his individual capacity did not have representation of his interests in the first suit and should not reasonably have expected to be bound by the first suit. See DKN Holdings, 61 Cal. 4th at 826.

Defendant has not established the required element of privity. He therefore has not met his burden to establish that claim preclusion applies.

### III.    Qualified Immunity

#### A.    Applicable Standard

Qualified immunity applies when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. District of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018); White v. Pauly, 137 S. Ct. 548, 551 (2017). Whether a government officer is entitled to qualified immunity rests on the answer to two questions: (1) "whether the officer violated a plaintiff's constitutional right" and (2) if there was a violation, "whether the constitutional right was clearly established in light of the specific context of the case at the time of the events in question." Mattos v. Agarano, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (internal quotation marks omitted); see also Saucier v. Katz, 533 U.S. 194, 201 (2001) (setting forth two-step test), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236

1    (2009) (district court has discretion in deciding which of the two prongs of the qualified immunity

2    analysis should be addressed first).

3         The court proceeds directly to the second prong in this instance. "Clearly established"

4    means the statutory or constitutional question was "beyond debate" such that every reasonable

5    official would understand that what he is doing is unlawful. See Wesby, 583 U.S. at 63; Vos v.

6    City of Newport Beach, 892 F.3d 1024, 1035 (9th Cir. 2018). To be "clearly established," a rule

7    must be dictated by controlling authority or a robust consensus of cases of persuasive authority.

8    Wesby, 583 U.S. at 583 U.S. at 63; Vos, 892 F.3d at 1035; see also Perez v. City of Roseville,

9    882 F.3d 843, 856-57 (9th Cir. 2018) (holding that Ninth Circuit precedent is sufficient to meet

10   the "clearly established" prong of qualified immunity). A case "directly on point" is not required.

11   Wesby, 583 U.S. at 64; Vos, 892 F.3d at 1035. Nonetheless, courts must define the law with a

12   "high degree of specificity" when applying qualified immunity. Wesby, 583 U.S. at 63. The key

13   question is "whether the violative nature of particular conduct is clearly established" in the

14   specific context of the case. Vos, 892 F.3d at 1035.

15                       **B.    Application to the July 2010 Modified Program**

16        Plaintiff argues defendant violated the law clearly established by (1) Johnson v.

17   California, 543 U.S. 499 (2005); (2) Richardson v. Runnels, 594 F.3d 666, 668 (9th Cir. 2010);

18   and (3) a 2009 court order directed to CSP-Solano in In re Marcellious Tucker, No. FCR-233502

19   (Cal. Sup. Ct. May 13, 2009). (ECF No. 60 at 14.) The undersigned agrees.

20        In Johnson v. California, the United States Supreme Court held strict scrutiny applies to

21   prisoners' Fourteenth Amendment challenges to race-based modified programs. 543 U.S. at 507.

22   After Johnson, prison officials "have to demonstrate that any race-based policies are narrowly

23   tailored" to further compelling governmental interests. Id. at 514.

24        In Richardson, inmates of a specific race were subjected to an extended lockdown in

25   response to violence involving inmates of that race. Richardson, 594 F.3d at 671. The Ninth

26   Circuit determined as follows:

27              The facts presented by the defendants show that, in several instances,
                assaults that were believed to be perpetrated or planned by prisoners
28              who were African–American led to the lockdown of all African–

                                               14

American inmates in a particular unit of the prison, among whom
was Richardson. The defendants apparently believe that without
showing any linkage between the perpetrators and the prisoners
subjected to the lockdown, it was enough to assume that race alone
tied together the perpetrators and the larger group. An assumption of
this kind is grounded on race.

Richardson, 594 F.3d at 671.

The Richardson court explained that to meet their summary judgment burden, the
defendants had to show "reasonable men and women could not differ regarding the necessity of a
racial classification in response to prison disturbances and that the racial classification was the
least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate
prison goals)." 594 F.3d at 671 (citing Johnson, 543 U.S. at 505). Material disputes of fact
prevented the entry of summary judgment for the defendants in Richardson because they "made
no evidentiary showing at all concerning the basis for regarding all African–Americans as a
security risk when one or a few African–American inmates are responsible for an assault." Id. at
671-72. Addressing the constitutional issue, the Ninth Circuit held "the assertion [of] a link
between an individual incident perpetrated by one or two inmates, and the risk of violence from
all the African–American prisoners in Facility D, with no evidentiary basis whatever indicated for
that belief, falls short." 594 F.3d at 671.

The 2009 court order in In re Tucker resulted from a habeas corpus petition filed in 2006
in Solano County Superior Court by CSP-Solano inmate Marcellious Tucker. In re Tucker, No.
FCF-233502. (See ECF No. 25 at 48-55.) Tucker alleged the prison's policy of keeping Black
inmates on lockdown following violent incidents was unconstitutional. The modified program
challenged in Tucker followed repeated instances of violence between groups of Black and
Hispanic inmates. (See ECF No. 25 at 50, fn.2.) At the summary judgment stage, the Solano
County Superior Court held as follows:

Petitioner proved that after fights occurred on June 30, 2005,
November 17, 2005, and May 24, 2006 in which some African
American prisoners were involved, Petitioner and all other African-
American inmates housed in his facility were locked down and then
kept on modified program. Petitioner proved that he has never been,
and is not now, a member or supporter of a prison or street gang or
disruptive group….] Petitioner proved that he was not a participant

in any capacity in any of these three incidents and that he was "locked down" (kept on modified program for periods ranging from 20 to 45 days solely as a result of his race because he, as were some of the participants, is African-American. Respondent did not prove that any of these incidents in fact constituted a "riot" or "war" fought between inmates solely on the basis of racial animus. Petitioner proved that inmates classified as different ethnicity than the participants were released into normal program before non-participating inmates classified as the same ethnicity as the participants, thereby treating Petitioner and other African-American inmates differently, and unfavorably, from other inmates who were the same in every respect except for their ethnicity.

(ECF No. 25 at 50 (footnote omitted).)

Applying <u>Johnson v. California</u> and the strict scrutiny standard, the Solano County Superior Court found

[r]espondent's policy of race-based lockdowns and race-based releases from modified program is premised on an assumption, not supported by the evidence, that all inmates… are obligated by virtue of their ethnicity or skin color… to racially-based umbrella gangs[.] The evidence, however, showed that not all inmates of a particular race or ethnicity will act as one united group in support of a gang or disruptive group. Petitioner is not, and never has been, a member of a street or prison gang or disruptive group.

(ECF No. 25 at 51.) The Solano County Superior Court concluded the prison's policy, which resulted in serious repercussions to the petitioner solely because he shares the same ethnicity as inmates engaging in violent behavior, was "not a narrow use of racial classification." (<u>Id.</u>) The court enjoined the respondent "from locking down and/or maintaining inmates on modified program based upon an inmate's ethnic or racial classification." (<u>Id.</u>)

Plaintiff argues the facts of <u>In re Tucker</u> and <u>Richardson</u> cannot be fairly distinguished from the facts relevant to the July 2010 modified program in this case. (ECF No. 60 at 17-18.) Defendant argues these authorities did not put a reasonable official in his position on notice that a modified program based partly on race violated the constitution. (ECF No. 61 at 7-9; ECF No. 58 at 14-15.) Defendant also argues the <u>In re Tucker</u> order was limited to CSP-Solano's lockdown policy as it existed before 2007, and thus that the injunction would not have put him on notice that the revised policy at issue in this case was obviously unconstitutional. (ECF No. 61 at 6.)[4]

_____

[4] Defendant does not expressly acknowledge the <u>In re Tucker</u> court's dicta addressing CSP-

1    Defendant's argument for qualified immunity defines the right at issue with too much

2    generality. The right at issue is plaintiff's right not to be placed on restrictive modified program

3    based on belief or assumption—not supported by evidence—that plaintiff poses an increased risk

4    of violence due to sharing the same race or ethnicity as one or two inmates responsible for an

5    instance of violence when it is unknown to what extent, if any, race played a role. This right was

6    clearly established. See Richardson, 594 F.3d at 671; In re Tucker, ECF No. 25 at 51. Defendant

7    was on notice that using a race-based classification during the July 2010 modified program in

8    such a manner was not narrowly tailored, and therefore violated the Fourteenth Amendment.

9    Defendant fails to distinguish this case from the holding of Richardson. Defendant

10   argues, first, unlike in Richardson, defendant in this case made "an evidentiary showing that all

11   White Skin Heads, and all non-affiliated Whites on Facilities I and II, posed a security risk

12   warranting the implementation of the modified programs." (ECF No. 61 at 7.) The court must

13   reject this argument. As determined by the Ninth Circuit on appeal, defendant's evidence on

14   summary judgment failed to establish a link between the individuals who perpetrated the

15   incidents at issue and a risk of violence from other White inmates. (ECF No. 42 at 4.)

16   Defendant argues, second, unlike in Richardson, where the prison imposed various

17   restrictions for approximately eight months, the modified program in the present case lasted only

18   30 days. (ECF No. 61 at 7.) However, the present claim does not arise in the Eighth Amendment

19   context which considers the duration of the deprivation along with other factors. See Johnson v.

20   Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (a court considers the "circumstances, nature, and

21   duration" of a deprivation in determining whether it violates the Eighth Amendment). The

22   standard defendant must meet is to show that reasonable men and women could not differ

23   regarding the necessity of the 30-day racial classification in response to the prison disturbances.

24   The court is mindful that the Supreme Court in Johnson v. California left open the

25   possibility that a racial classification could pass constitutional muster, reiterating "only a social

26

27   _____

     Solano's revised policy. Noting the revised policy was not then before it, the In re Tucker court
     expressed "concern[ ] that the revised policy will ultimately fail constitutional scrutiny" because
28   it "continues to use race and skin color as proxies for gangs[.]" (ECF No. 25 at 53.)

emergency rising to the level of imminent danger to life or limb – for example, a prison race riot, requiring temporary segregation of inmates—can justify an exception to the principle embodied in the Fourteenth Amendment[.]" 543 U.S. at 512-13 (citing Lee v. Washington, 390 U.S. 333 (1968)). Race-based security measures may still survive strict scrutiny analysis as a response to race-based violence. See e.g., Hurd v. Garcia, 454 F. Supp. 2d 1032, 1052-53 (S.D. Cal. 2006) (upholding race-based security measure keeping African American and Caucasian inmates on lockdown following a race riot as narrowly tailored).

Here, though, viewing the undisputed facts in a light favorable to plaintiff, as the court must, defendant used a race-based classification based on an unsubstantiated belief of a link between the individuals who perpetrated the incidents at issue and a risk of violence from White inmates in Facilities I and II, as opposed to other inmates in Facilities I and II, without evidence to support that link. In this regard, defendant treated plaintiff differently and more unfavorably than other inmates solely on the basis of race. Defendant was on clear notice that using such a racial classification to justify a lockdown or restrictive modified program for inmates of a particular race violated the Fourteenth Amendment under the circumstances confronted. See Johnson v. California, 543 U.S. at 513; Richardson, 594 F.3d at 671; In re Tucker, ECF No. 25 at 51. Defendant is not entitled to qualified immunity on summary judgment.

////

////

////

////

////

////

////

////

////

////

////

1    ////

2              **IV.**      **Conclusion and Recommendation**

3          In accordance with the above, IT IS RECOMMENDED that defendant's further grounds

4 in support of summary judgment on plaintiff's remaining equal protection claim be denied.

5          These findings and recommendations are submitted to the United States District Judge

6 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days

7 after being served with these findings and recommendations, any party may file written

8 objections with the court and serve a copy on all parties. Such a document should be captioned

9 "Objections to Magistrate Judge's Findings and Recommendations." Any response to the

10 objections shall be served and filed within fourteen days after service of the objections. The

11 parties are advised that failure to file objections within the specified time may waive the right to

12 appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

13 Dated:  April 24, 2024

14

15                                                       

16   DLB7                                 DEBORAH BARNES

17   edwa2218.supp.sj                   UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28